**NONCONFIDENTIAL**
**No. 2013-1002**

# United States Court Of Appeals
# For The Federal Circuit

BAYER CROPSCIENCE AG,

*Plaintiff-Appellant,*

v.

DOW AGROSCIENCES LLC,

*Defendant-Appellee.*

————————————

Appeal from the United States District Court for the District of Delaware, Case No. 10-CV-1045, Judge Renée M. Bumb

————————————

## ANSWERING BRIEF OF DEFENDANT-APPELLEE DOW AGROSCIENCES LLC

————————————

Elizabeth A. Howard
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025

Peter A. Bicks
Alex V. Chachkes
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019

Mark S. Davies
Rachel M. McKenzie
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1152 15th Street, N.W.
Washington, D.C. 20005
(202) 339-8400

*Attorneys for Defendant-Appellee Dow AgroSciences LLC*

# CERTIFICATE OF INTEREST

Counsel for defendant-appellee certify the following:

1.      We represent Dow AgroSciences LLC.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented:

Not applicable.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented:

Dow AgroSciences LLC is a wholly owned subsidiary of The Dow Chemical Company.

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented in trial court or agency or are expected to appear in this court are:

ORRICK, HERRINGTON & SUTCLIFFE LLP

Peter A. Bicks
Alex V. Chachkes
Mark S. Davies
Elizabeth A. Howard
Rachel M. McKenzie
Hardip B. Passananti
Joseph A. Sherinsky
Katherine M. Kopp

ASHBY & GEDDES, P.A.

Steven J. Balick
Lauren E. Maguire
Andrew C. Mayo


Dated:  February 19, 2013          Respectfully submitted,

                                   By: /s/ Mark S. Davies
                                   *Attorney for Defendant-Appellee*
                                   *Dow AgroSciences LLC*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................. v

STATEMENT OF RELATED CASES ................................................. ix

INTRODUCTION ............................................................................... 1

STATEMENT OF THE ISSUES ......................................................... 2

STATEMENT OF THE CASE ............................................................ 3

STATEMENT OF THE FACTS .......................................................... 4

    Genetic Modification Of Plants Can Make Them Resistant
    To The 2,4-D Herbicide ............................................................ 4

    DAS's Enlist™ Products ............................................................ 7

    Bayer Sues DAS ......................................................................... 9

    The District Court Grants Summary Judgment Of
    Noninfringement ...................................................................... 16

SUMMARY OF THE ARGUMENT ................................................. 20

STANDARD OF REVIEW ................................................................ 25

ARGUMENT ..................................................................................... 26

I.    BAYER'S PATENT COVERS ONLY GENES ENCODING
    2,4-D MONOOXYGENASES ..................................................... 27

    A.    The District Court Construed "Biological Activity Of
        2,4-D Monooxygenase" According To The Undisputed
        Meaning Of The Term The Applicants Chose ..................... 27

        1.    Dr. Streber and the other applicants chose to
            claim all genes that code for enzymes with the
            "biological activity of 2,4-D monooxygenase." ............ 28

        2.    It is undisputed that a "monooxygenase" is an
            enzyme where "one atom of oxygen … ultimately
            forms water." ............................................................. 32

    B.    There Is No Legitimate Reason To Depart From The
        Settled Understanding Of "Monooxygenase" ..................... 36

1.    The "only possible" construction excludes the
      preferred embodiment..................................................37

2.    The patent does not define monooxygenase as any
      enzyme that "cleaves the side chain."........................43

3.    The district court did not abuse its discretion in
      holding a *Markman* hearing. ......................................50

II.    BAYER'S INVENTION IS LIMITED TO *TFDA*...........................53

   A.    The Claims Should Be Limited To The *tfdA* Invention
         Disclosed In The Patent.......................................................54

   B.    The "Growth Test" Disclosed In The Patent Confirms
         That The Invention Relates To *tfdA*....................................58

   C.    The Prosecution History Confirms That Claims Should
         Be Limited To The *tfdA* Invention Disclosed In The
         Patent .................................................................................60

III.   AS CONSTRUED BY BAYER, THE '401 PATENT IS
       INVALID FOR LACK OF AN ADEQUATE WRITTEN
       DESCRIPTION ...............................................................61

   A.    The Patent Does Not Disclose Structural Features
         Common To All Claimed Genes, Does Not Disclose A
         Representative Number Of Genes, And Does Not
         Disclose A Correlation Between Function And
         Structure ..............................................................................63

   B.    A "Growth Test" Is Not An Adequate Description Of
         Genes....................................................................................66

   C.    There Is No Genuine Dispute That The "Growth Test"
         Disclosed In The '401 Patent Cannot Isolate A Large
         Number Of Genes That Degrade 2,4-D ..............................70

CONCLUSION .....................................................................................72

Material has been deleted from pages 9 and 64 of the nonconfidential Answering Brief of Defendant-Appellee Dow Agrosciences LLC. This material is deemed confidential information pursuant to the Protective Order entered July 19, 2011. The material omitted from these pages contains confidential deposition testimony and confidential business information.

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ariad Pharms., Inc. v. Eli Lilly & Co.,*
    598 F.3d 1336 (Fed. Cir. 2010) (en banc) ......................... 24, 61, 62, 67

*Ariad Pharms., Inc. v. Eli Lilly & Co.,*
    560 F.3d 1366 (Fed. Cir. 2009) ......................................................... 62

*Atlantic Research Mktg. Sys. v. Troy,*
    659 F.3d 1345 (Fed. Cir. 2011) ....................................................... 63

*Bancorp Servs. LLC v. Sun Life Assurance Co. of Canada (U.S.),*
    687 F.3d 1266 (Fed. Cir. 2012) ....................................................... 53

*Bowey v. West,*
    218 F.3d 1373 (Fed. Cir. 2000) ....................................................... 63

*Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.,*
    541 F.3d 1115 (Fed. Cir. 2008) ......................................... 6, 65, 66, 68

*Chef Am., Inc. v. Lamb-Weston, Inc.,*
    358 F.3d 1371 (Fed. Cir. 2004) .............................................. 38, 41, 42

*In re Crish,*
    393 F.3d 1253 (Fed. Cir. 2004) ......................................................... 6

*Data Gen. Corp. v. IBM Corp.,*
    93 F. Supp. 2d 89 (D. Mass. 2000)................................................... 52

*De La Rosa v. Holder,*
    598 F.3d 103 (2d Cir. 2010) ............................................................. 63

*DESA IP, LLC v. EML Techs., LLC,*
    211 F. App'x 932 (Fed. Cir. 2007)............................................... 51, 52

*Devine v. Sutermeister,*
    733 F.2d 892 (Fed. Cir. 1984) ......................................................... 63

*Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*,
   214 F.3d 1302 (Fed. Cir. 2000) ........................................................... 39

*Eli Lilly & Co. v. Teva Pharms. USA, Inc.*,
   619 F.3d 1329 (Fed. Cir. 2010) ................................................... 62, 63

*EMI Grp. N. Am., Inc. v. Intel Corp.*,
   157 F.3d 887 (Fed. Cir. 1998) ........................................................... 52

*Enzo Biochem, Inc. v. Gen-Probe Inc.*,
   323 F.3d 956 (Fed. Cir. 2002) ..................................................... 69, 70

*Fiers v. Revel*,
   984 F.2d 1164 (Fed. Cir. 1993) ......................................................... 68

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
   527 F.3d 1379 (Fed. Cir. 2008) ......................................................... 40

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*,
   452 F.3d 1312 (Fed. Cir. 2006) ................................................... 54, 57

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*,
   381 F.3d 1111 (Fed. Cir. 2004) ......................................................... 27

*Key Pharms. v. Hercon Labs. Corp.*,
   161 F.3d 709 (Fed. Cir. 1998) ........................................................... 25

*Lacks Indus., Inc. v. McKechnie Vehicle Components USA, Inc.*,
   322 F.3d 1335 (Fed. Cir. 2003) ......................................................... 38

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   481 F.3d 1371 (Fed. Cir. 2007) ......................................................... 62

*Lucent Techs., Inc. v. Gateway, Inc.*,
   525 F.3d 1200 (Fed. Cir. 2008) ................................................... 39, 40

*Lydall Thermal/Acoustical, Inc. v. Federal-Mogul Corp.*,
   344 F. App'x 607 (Fed. Cir. 2009) ..................................................... 54

*Markman v. Westview Instruments, Inc.*,
   517 U.S. 370 (1996) ................................................................... 18, 51

*Merrill v. Yeomans,*
   94 U.S. 568 (1876) ............................................................... 1

*Microsoft Corp. v. Multi-Tech Sys., Inc.,*
   357 F.3d 1340 (Fed. Cir. 2004) ........................................ 54

*Multiform Desiccants, Inc. v. Medzam, Ltd.,*
   133 F.3d 1473 (Fed. Cir. 1998) ........................................ 49

*N. Am. Container, Inc. v. Plastipak Packaging, Inc.,*
   415 F.3d 1335 (Fed. Cir. 2005) ........................................ 40

*Oatey Co. v. IPS Corp.,*
   514 F.3d 1271 (Fed. Cir. 2008) ........................................ 39

*In re O'Farrell,*
   853 F.2d 894 (Fed. Cir. 1988) .......................................... 6

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.,*
   520 F.3d 1358 (Fed. Cir. 2008) ................................... 37, 38

*Phillips v. AWH Corp.,*
   415 F.3d 1303 (Fed. Cir. 2005) (en banc) ................... *passim*

*PowerOasis, Inc. v. T–Mobile USA, Inc.,*
   522 F.3d 1299 (Fed. Cir. 2008) ................................... 25, 26

*In re Rembrandt Techs., LP,*
   No. 2012-1022, 2012 WL 4017470 (Fed. Cir. Sept. 13, 2012) ............ 54

*Regents of the Univ. of Cal. v. Eli Lilly & Co.,*
   119 F.3d 1559 (Fed. Cir. 1997) ........................................ 68

*Renishaw PLC v. Marposs Societa' per Azioni,*
   158 F.3d 1243 (Fed. Cir. 1998) ........................................ 49

*Sanofi-Aventis Deutschland GmbH v. Genentech, Inc.,*
   473 F. App'x 885 (Fed. Cir. 2012) .................................... 49

*Schering Corp. v. Amgen Inc.,*
   222 F.3d 1347 (Fed. Cir. 2000) ........................................ 33

*Sys. Div., Inc. v. Teknek, LLC*,
    298 F. App'x 950 (Fed. Cir. 2008) ...................................................... 63

*TechSearch L.L.C. v. Intel Corp.*,
    286 F.3d 1360 (Fed. Cir. 2002) ........................................................ 25

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp*,
    587 F.3d 1339 (Fed. Cir. 2009) ......................................................... 34

*Univ. of Rochester v. G.D. Searle & Co., Inc.*,
    358 F.3d 916 (Fed. Cir. 2004) .......................................................... 68

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007) ......................................................... 54

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ......................................... 27, 40, 50, 51

*White v. Dunbar*,
    119 U.S. 47 (1886) ............................................................................ 1

## STATUTES

35 U.S.C. § 112 ................................................................... *passim*

## OTHER AUTHORITIES

R.H. Don & J.M. Pemberton, *Genetic and Physical Map of the 2,4-Dichlorophenoxyacetic Acid-Degradative Plasmid pJP4*, 161 J. Bacteriol 466 (Jan. 1985) ............................................................ 10, 11

Edward J. Perkins et al*., Use of Alcaligenes eutrophus as a Source of Genes for 2,4-D Resistance in Plants*, 35 Weed Sci. 12 (Supp. 1) (1987) ............................................................................ 10

Steven Soter, *What Is A Planet?*, Scientific American, Dec. 16, 2006 ..................................................................................... 43

A. Walker, Patent Laws (3d ed. 1895) ................................................ 51

## STATEMENT OF RELATED CASES

No appeal in or from this action was previously before this or any other appellate court. Dow AgroSciences LLC ("DAS") and Bayer Cropscience AG ("Bayer") are currently involved in several district court actions (*see, e.g., Bayer CropScience A.G. and Bayer S.A.S. v. Dow AgroSciences LLC*, No. 1:12-cv-256-RGA (D. Del. filed Mar. 2, 2012); *Bayer CropScience A.G. and Bayer CropScience NV v. Dow AgroSciences LLC, Mycogen Plant Science, Inc., Agrigenetics, Inc. and PhytoGen Seed Co., LLC,* No. 2:12-cv-47 (E.D. Va. filed Jan. 20, 2012)), but none involving the patents-in-suit and none before this Court. The outcome of this appeal could affect the case in the Eastern District of Virginia, which is currently stayed pending International Chamber of Commerce Arbitration No. 18892/VRO/AGF.

# INTRODUCTION

When a patent applicant uses scientific guesswork to craft and obtain a claim to a broad class of inventions, a district court should not rewrite the claim merely because the guess turns out to be wrong.  This common sense proposition flows from what is perhaps the central tenet of patent law:  "nothing can be more just and fair, both to the patentee and the public, than that the former should understand, and *correctly describe*, just what he has invented, and for what he claims a patent."  *Merrill v. Yeomans*, 94 U.S. 568, 573-74 (1876) (emphasis added).  "Because the patentee is required to 'define precisely what his invention is,' … it is 'unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *White v. Dunbar*, 119 U.S. 47, 52 (1886)).

In this case, Bayer chose to write a patent claim relying on guesswork, and the district court correctly declined to rewrite the claim when Bayer came to regret the choice.  Bayer's researchers had ample warning that the gene they were studying (the *tfdA* gene) did not encode an enzyme with a particular well-understood biological mechanism, that of a "monooxygenase."  Ignoring the warning signs and

hoping to obtain a broad claim based upon the function of the gene, the patent applicants gambled and wrote that particular enzymatic mechanism into the asserted claim. In doing so, it is undisputed that the resulting claim invokes a distinct mechanism *not used* in the reaction facilitated by the gene the researchers were studying.

This "mistake" was not inevitable. As detailed below, there were many ways for Bayer's researchers to write a claim that avoided any guesswork. But having chosen a particular path with fingers crossed, Bayer cannot invoke the federal courts now that it has reached a dead end. The district court recognized as much, and DAS respectfully submits that this Court should as well.

## STATEMENT OF THE ISSUES

1. U.S. Patent No. 6,153,401 ('401 patent) uses the term "2,4-D monooxygenase" (or its technical equivalent, "DPAM") fifty-two times, including in the title of the patent. The only independent claim refers to the "biological activity of 2,4-D monooxygenase." Before the Patent and Trademark Office ("PTO"), the inventors elected to pursue only those claims "drawn to a 2,4-D monooxygenase gene." Did the district court correctly conclude that the claim covers only genes that code for monooxygenases that degrade 2,4-D?

2.  The '401 patent consistently refers to the "present invention" as the *tfdA* gene.  Does the patent claim only the *tfdA* gene?

3.  The '401 patent only discloses one DNA sequence—that of *tfdA*—and does not describe any of the structural features common to genes that cleave the side chain" of 2,4-D.  If the '401 patent claims *any* DNA sequence that encodes *any* enzyme that cleaves the side chain of 2,4-D, should the Court defer to the district court's finding that the patent fails to provide an adequate written description (35 U.S.C. § 112)?

## STATEMENT OF THE CASE

Bayer sued DAS in the District of Delaware for infringement of the '401 patent.  Bayer claims that DAS's Enlist™ seeds infringe the patent's claim to genes that code for "2,4-D monooxygenase" enzymes.  The district court concluded that DAS's seeds do not infringe because they produce a bacterial *dioxygenase* enzyme.  On September 28, 2012, the district court adopted DAS's proposed claim construction of the claim term "biological activity of 2,4-D monooxygense" and granted DAS's motion for summary judgment of noninfringement.  The district court also stated that even if it had adopted Bayer's broad functional construction, DAS would still be entitled to summary judgment because

the patent failed to meet the written description requirement of

35 U.S.C. § 112.

## STATEMENT OF THE FACTS

DAS has used recombinant DNA techniques to confer herbicide

resistance to plants and is set to embark on a major initiative to bring

this technology to market.  In response, Bayer has launched an effort to

convince the court system to ignore a term it deliberately placed at the

center of a patent and to leverage its disclosure of a single gene into a

claim to a diverse class of genes its researchers never disclosed.  The

district court properly rejected Bayer's scheme.

### Genetic Modification Of Plants Can Make Them Resistant To The 2,4-D Herbicide[1]

2,4-Dichlorophenoxyacetic acid, commonly referred to as "2,4-D,"

is a widely used herbicide.  *See* A12,675, col. 2:18-22.  It can kill

unwanted weeds, such as those that grow between crops, by mimicking

a particular type of plant hormone ("auxin") that can lead to

uncontrolled and disorganized plant growth and ultimately death.  *Id*.

---

[1]    DAS explained the scientific concepts relevant to this appeal in a short video tutorial provided to the district court, which it has submitted as a Supplementary Video Appendix ("SVA").

at col. 2:36-42.  2,4-D kills many unwanted broadleaf weeds that grow between rows of crops.  *Id*.  Application of the herbicide to weeds in row crops can lead to increased crop yields because the crop no longer has to compete with weeds for water, nutrients, and sun.

This case involves genetic modifications that allow a plant to be "resistant" to 2,4-D.  The genetic modification acts as a bulletproof vest for a plant.  If scientists can make a plant resistant to a particular herbicide, a farmer can use the herbicide on fields to control weeds without fear of damaging the crop.

The genetic modification at issue in this case occurs within the DNA of the plants' cells.  The structures and mechanisms of most organisms are largely dependent on proteins—from cells and tissues to antibodies and enzymes.  A5608-09.  In all living organisms, proteins, including enzymes, are encoded by DNA.  Because of the central and diverse roles of proteins, an organism's DNA determines that organism's particular characteristics.  A5608.

A "gene" is a functional unit of DNA that carries a particular set of instructions.  DNA ordinarily exists as a double-stranded molecule where each strand is made up of subunits known as "nucleotides."

A5607. DNA "encodes" instructions in its particular arrangement of nucleotide bases. The particular instructions (*i.e.*, the specific sequence of nucleotides) that make up a gene constitute its "structure." *In re Crish*, 393 F.3d 1253, 1258 (Fed. Cir. 2004); *see also* A50, col.1:56 (referring to the "structure" of the *tfdA* gene).

A gene may code for a specific enzyme. Enzymes are a particular type of protein "that catalyze biochemical reactions." *In re O'Farrell*, 853 F.2d 894, 895-96 (Fed. Cir. 1988); A5608-09; A5272-73.

When scientists wish to produce a particular enzyme in an organism, they often use "[r]ecombinant DNA" techniques. *See, e.g.*, *Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*, 541 F.3d 1115, 1118 (Fed. Cir. 2008). The scientist will typically insert a particular gene directly into the DNA of an organism such as a plant. As the cells of the organism reproduce themselves, the gene of interest is replicated. *Id.* The insertion of the gene into the organism often is by use of a "plasmid." A plasmid is a "small circular loop[] of DNA found in bacteria." *Id.* (internal quotation marks and citation omitted).

**DAS's Enlist™ Products**

Genetically engineered glyphosate tolerant crops ("GTCs")—including corn, soybeans, and cotton—were introduced in the mid-1990s.  A12,675, col. 1:20-21, 25-26.  Because the use of the herbicide glyphosate with GTCs provided a "simple, convenient, flexible and inexpensive tool for controlling a wide spectrum of broadleaf and grass weeds," farmers were quick to adopt GTCs.  *Id.* at col. 1:26-29.  Over time, the "[e]xtensive use" of glyphosate-only programs resulted in both "the propagation of weed species that are inherently more tolerant to glyphosate" and an increasing prevalence of "weeds that … had not been an agronomic problem prior to the wide use of GTCs."  *Id.* at col. 1:58-61, col. 2:5-8.

DAS recognized that farmers could "compensate for glyphosate's weaknesses by," among other things, "mixing" glyphosate with "2,4-D," a herbicide which had been used "agronomically and in non-crop situations for broad spectrum, broadleaf weed control for more than 60 years."  *Id.* at col. 2:16-22.  But to use 2,4-D to control weeds, crops would have to be made resistant to that herbicide as well.

Accordingly, DAS "synthesized and expressed" the "[g]enes encoding candidate enzymes" in bacteria (*E. coli*) and assessed their "biochemical and physiological properties." A547. DAS eventually focused on two genes, *aad-1* and *aad-12*, which coded for the AAD-1 and AAD-12 enzymes. Testing the AAD enzymes on numerous herbicides, DAS discovered that they degraded not only 2,4-D, but other popular herbicides as well, "enabl[ing] expanded broadleaf weed control," and in the case of AAD-1, expanded grass control. A547; *see also* A12,676, col. 4:23-37; A4984.

Based on this research, DAS has developed a line of genetically modified seed products as part of the Enlist™ Weed Control System. The seeds produce corn, soybeans, and cotton resistant to both 2,4-D and certain other popular auxinic herbicides.[2] *See* A597-98; A281-82. Once launched, DAS's products will allow farmers to use effective combinations of herbicides over the top of Enlist™ crops. To date, DAS

---

[2]    In 2005, DAS applied for patents based on this research. *See* A12,649; A4979. U.S. Patent No. 7,838,733 issued on November 23, 2010, covering plants transformed by the *aad-1* gene. A12,649. U.S. Patent No. 8,283,522 issued on October 9, 2012 covering plants transformed by the *aad-12* gene.

Confidential Material
Omitted

has spent 10 years and millions of dollars developing these products.

*See* A417 ███████████████████████████████████

████████████████████████████████████████; *see also*

A281.

## Bayer Sues DAS

Dusting off a patent based on an application filed more than twenty years ago, Bayer sued DAS for manufacturing and preparing to sell its Enlist™ products.  A72-74; A1676-77.

***Bayer's research.***  The '401 patent resulted from a 1987 application by Dr. Wolfgang Streber and two other inventors for a patent on "Microorganisms and Plasmids for 2,4-Dichlorophenoxyacetic Acid (2,4-D) Monooxygenase Formation and Process for the Production of These Plasmids and Strains."  A32.  "At th[e] time [of the patent application,] it was known that several species of bacteria could grow on 2,4-D through a metabolic process that involved, as its first step, the degradation of 2,4-D into 2,4-dichlorophenol," or 2,4-DCP, a substance that is not toxic to plants.  A5-6; *see also* A53, col. 8:6-13.  One such species was *Alcaligenes eutrophus*.  A50, col. 1:41-56.  Other scientists had already located five genes "essential for the degradation of 2,4-D"—

*tfdB*, *tfdC*, *tfdD*, *tfdE*, and *tfdF*—on a plasmid from that bacteria. A12,444; *see also* A50, col. 1:41-51.[3]

Bayer's researchers used that well-known plasmid to isolate the *tfdA* gene. A50, col. 1:13. Scientists had already confirmed that the plasmid included the *tfdA* gene and had pinpointed the region of the plasmid where the gene was located using recombinant DNA techniques. *See* Edward J. Perkins et al*., Use of Alcaligenes eutrophus as a Source of Genes for 2,4-D Resistance in Plants*, 35 Weed Sci. 12-18 (Supp. 1) (1987); A10,377, A10,380 (identifying the Perkins article as prior art). These scientists also suggested that one could introduce this gene into plants, using techniques known at the time, to render them resistant to 2,4-D. *Id.* at 12-18. In particular, it was known that the *tfdA* gene coded for the enzyme TfdA, which triggered the first, or "A," step of 2,4-D degradation. *See*, *e.g.*, R.H. Don & J.M. Pemberton, *Genetic and Physical Map of the 2,4-Dichlorophenoxyacetic Acid-*

---

[3]     The "tfd" portion of these gene names is an acronym for "two, four-D," and the last letter refers to the sequential step in the process of metabolizing, or breaking down, 2,4-D in which the gene's corresponding enzyme is involved.

*Degradative Plasmid pJP4,*  161 J. Bacteriol 466-68 (Jan. 1985);
A10,377, A10,379 (identifying the Don article as prior art).

TfdA leads to resistance to 2,4-D through a process that involves
"cleav[ing]" the side chain of harmful 2,4-D and converting it into the
harmless 2,4-DCP.  OB 2.  The process works by, among other things,
"hydroxylation," the addition of a hydroxyl group to a carbon atom in
2,4-D.  A2960.

When Dr. Streber and the other applicants sought U.S. patent
protection for their research relating to *tfdA*, they needed to write a
patent specification and claim the gene described.  They could have
written only claims expressly limited to the *tfdA* gene.  Or they could
have limited the invention to genes that encode "hydroxylase" enzymes,
a well-established "catch-all" term.  A10,907-08.  Or, before claiming
their invention in terms of its specific enzymatic activity, the
researchers could have better understood the way the gene and its
enzymes worked.  As detailed below at 30-32, Dr. Streber had conducted
an experiment that "should have suggested," that the researchers did
not understand the enzymatic mechanism of TfdA.  A8, n.4.  Instead of
these various options, Dr. Streber and the other applicants decided to

11

rely on guesswork:  they elected to write a broad claim based on the assumption that *tfdA* encodes an enzyme that functions as a "monooxygenase."

An "oxygenase" is an enzyme that facilitates a chemical reaction in the presence of an oxygen molecule, breaking apart that molecule. An oxygen molecule consists of two oxygen atoms bonded together.  An oxygenase enzyme causes, among other things, the two bonded oxygen atoms to "accept" electrons from the enzyme or one of its cosubstrates.[4] This, in turn, breaks apart the oxygen molecule, freeing up the individual oxygen atoms for reactions with the other cosubstrates.

Importantly for this dispute, there are two well recognized scientific classifications of oxygenases:  "monooxygenases" and "dioxygenases."  A monooxygenase facilitates a reaction where one oxygen atom ends up in a water molecule and the other oxygen atom ends up in a product other than water.  *See* A9; A10,808, A10,861-62; A5274.  In contrast to a monooxygenase, a dioxygenase facilitates a

---

[4]    A "substrate" is a molecule upon which an enzyme acts.  A "cosubstrate" is a cofactor necessary for the activity that participates in the reaction.  *See*, *e.g.*, A5272-73.

reaction where **both** oxygen atoms in molecular oxygen end up in products other than water.  *See* A9; A5274.  The prefixes "mono" and "di" thus refer to the fate of the two oxygen atoms of the oxygen molecule—if only one oxygen atom ends up in a product other than water, the appropriate prefix is "mono"; if both oxygen atoms end up in products other than water, the correct prefix is "di."

As explained below (at 32-36), this distinction between monooxygenases and dioxygenases was known well before Bayer's *tfdA* research in the mid-1980s.  *See* A19; A10,808-09, A10,861-62.  And the distinction is important.  As Bayer's expert, Dr. Robert Hausinger, stated, it is "scientifically invalid" to call a dioxygenase a monooxygenase.  A10, n.5; *see also* A10,755.

In 1993, four years after Bayer filed its application, Dr. Hausinger confirmed what Dr. Streber's pre-patent filing experiments had suggested:  TfdA is not a monooxygenase.  *See* A5202-08; A5209-11; A5212-21.  It is a dioxygenase.  *See, e.g.*, A5202-08.

***The '401 patent.***  From its outset, the '401 patent explains that the invention "relates to the production, by genetic engineering, of plasmids and bacterial strains containing the gene tfdA, or a gene

13

essentially identical to tfdA, on a short, exactly characterizable DNA segment." A50, col.1:1-14.[5]  Consistent with that characterization, the specification states that "[i]t has now been possible for the first time thanks to the present invention to isolate, to clone, and to characterize the gene tfdA."  *Id.*, col. 1:59-61.  It further states that "[i]t has thus become possible to make *this gene* available for transfer to other organisms with the objective of expressing *the tfdA-encoded 2,4-D-monooxygenase* in these organisms."  *Id.*, col.1:61-64 (emphasis added).  And Figure 10 shows the nucleotide sequence of a larger fragment of plasmid DNA on which the gene *tfdA* is located.  *See* A40-44; A54*,* col. 10:58-59 ("The arrows designate the beginning and end of the coding region of tfdA (Example 16).").  Other references to the invention as related to *tfdA* abound.  *See infra* at 55-56.

---

[5]     Typically, the name of the gene, *tfdA*, is italicized and the last letter is capitalized, while the name of the corresponding enzyme, TfdA, is not italicized and both the first and last letters are capitalized.  In the text of the '401 patent, however, the name of the gene is not italicized, and the last letter often is not capitalized.  Bayer's expert agreed that the capitalization in the patent is random and carries no substantive import.  *See* A11,055.  All quotes from the patent in this brief reflect how the name of the gene and the enzyme appear in the patent.

The specification also refers to "genes substantially identical to tfda (e.g., hybridizing with the gene of this invention and coding for a protein which has the biological activity of the protein encoded by tfda, e.g., its 2,4-D-monooxygenase activity)." A50, col. 2:64-66. But the patent does not identify which regions of the gene—the "structure"—correlate to the recited biological activity in claim 1. *See infra* at 64-66. For example, the DNA sequence in Figure 10 gives no indication which regions of the *tfdA* gene are required for the desired biological activity.

Reflecting the researchers' guesswork, the patent specification repeatedly and consistently refers to the *tfdA* gene as encoding a "2,4-D monooxygenase." The specification uses the term "2,4-D monooxygenase" or "DPAM," short for "dichlorophenoxyacetic acid monooxygenase," fifty-two times. *See, e.g.*, A50, col. 1:14-16; A53, col. 8:6-8. Indeed, the term "monooxygenase" is in the very title of the patent. A32.[6]

Claim 1, the only independent claim of the patent, recites:

---

[6]    During prosecution, the inventors repeatedly emphasized to the PTO that their invention concerned a "2,4-D monooxygenase gene" and its corresponding "2,4-D monooxygenase protein." *See* A5346-47; A4517; A5284; A5289.

> A recombinant gene, comprising ***a DNA sequence encoding a polypeptide having the biological activity of 2,4-D monooxygenase*** which is capable of being expressed in a plant, operably linked to a heterologous promoter capable of promoting the expression in a plant of a structural gene operably linked thereto.

A65, col. 32:10-19 (emphasis added).  The other fifteen claims of the patent all depend on claim 1.

Bayer's scientists were well aware of Dr. Hausinger's research. *See* A13,648-50.  Dr. Kenneth Timmis, a named inventor of the '401 patent, was an editor of the journal that published Dr. Hausinger's 1993 paper discussed above.  A13,309-11; A13314.  And Dr. Timmis published a paper in 1995 describing *tfdA* as encoding a dioxygenase. A5222-28.  Yet in the seven years between the publication of Dr. Hausinger's paper and the issuance of the '401 patent, Bayer made no attempt to amend or correct its application to reflect how TfdA actually operates in a biological system.

**The District Court Grants Summary Judgment Of Noninfringement**

DAS's Enlist™ seeds contain neither *tfdA* nor any gene encoding a 2,4-D monooxygenase.  Nevertheless, Bayer asserted infringement on the grounds that the Enlist™ seeds "include a recombinant gene

16

comprising the biological activity of bringing about the cleavage of the side chain of 2,4-D." A73.

The parties disagreed on how certain key terms in claim 1 of the '401 patent—the sole independent claim—should be construed. With regard to the "biological activity of 2,4-D monooxygenase," DAS argued that, in keeping with the plain and ordinary meaning of "monooxygenase," the term should be construed to cover only those enzymes that degrade 2,4-D in the way that a monooxygense would: by adding one atom of molecular oxygen to 2,4-D and reducing the other to water. A5154. Bayer, on the other hand, argued that the "biological activity of 2,4-D monooxygenase" should include all genes that encode enzymes that "cleav[e] … the side chain of 2,4-D." A4309.

DAS also argued that the court should limit the term "a DNA sequence encoding a polypeptide" to the only DNA sequence actually disclosed in the patent: that of *tfdA*. A5165. Bayer argued that the term should be construed to reach any DNA sequence encoding any protein that "cleaves the side chain" of 2,4-D. A4305.

Based on their claim construction positions, the parties filed cross-motions for summary judgment on infringement. *See* A4443; A5391.

Bayer did not dispute that if either of DAS's claim construction positions were accepted, DAS's accused products do not infringe the '401 patent. *See* A6067-68; A24. DAS's enzymes, both dixoxygenases, are structurally different, only having "28% and 31% amino acid sequence identity to TfdA, respectively." A547. As DAS explained to the district court, its genes "are about as similar to the Bayer *tfdA* gene as a corn seed is to an elephant." SVA, Chapter 8: Dow AgroSciences and the Enlist System, at 2:43–2:56.

DAS also moved for summary judgment of invalidity on multiple grounds. Relevant to this appeal, DAS argued that if claim 1 reaches what Bayer alleges, then the '401 patent provides an inadequate written description under 35 U.S.C. § 112. *See* A5544; A5548.

In June 2012, the court held a four-day hearing pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996) ("*Markman*"). DAS presented two experts—Dr. Joseph M. Bollinger, A10,849, Professor in the Department of Chemistry and the Department of Biochemistry and Molecular Biology at Pennsylvania State University, A2950; and Dr. Martin F. Yanofsky, A11,093, Distinguished Professor in the Section of Cell and Developmental

Biology at the University of California, San Diego, A5498.  Bayer

presented three experts—Dr. Robert P. Hausinger, A10,675, Professor

and Associate Chairperson in the Department of Microbiology and

Molecular Genetics and a Professor in the Department of Biochemistry

and Molecular Biology at Michigan State University, A941; Dr. Alan M.

Jones, A10,973, Professor in the Department of Biology at the

University of North Carolina at Chapel Hill, A4330; and Dr. Ann G.

Matthysse, A11,196, Professor in the Department of Biology at the

University of North Carolina at Chapel Hill, A4561.

Following that hearing, the district court issued a detailed

opinion.  The district court found that there was no genuine dispute as

to the plain meaning of "biological activity" and "2,4-D monooxygenase"

to those of ordinary skill in the art at the time the patent was filed.

A13.  In accordance with that meaning, it construed "biological activity

of 2,4-D monooxygenase" as "the enzymatic activity of an enzyme, in a

biological system, that causes a reaction with 2,4-D, and two [atoms] of

oxygen, where one [atom] of oxygen is added to 2,4-D and the other

ultimately forms water."  A15.  Because it adopted DAS's proposed

construction of "biological activity of 2,4-D monooxygenase," the court

19

granted summary judgment of noninfringement to DAS. A24. It concluded that it "need not address" the remaining disputed terms in claim 1. A25; *see also* A11.

The court also stated that even if it had "accepted Bayer's broad functional-based … construction" of claim 1, "summary judgment in favor of [DAS] would … be warranted" for lack of the written description required by 35 U.S.C. § 112. A25. Because the district court adopted DAS's construction of "biological activity of 2,4-D monooxygenase" and granted summary judgment of noninfringement, however, it denied as "moot" DAS's motion for summary judgment of invalidity based on the inadequacy of the patent's written description. A30.

Bayer appeals. A12,276-78.

## SUMMARY OF THE ARGUMENT

**I.** The district court correctly granted summary judgment of noninfringement. Bayer's patent claims genes that code for monooxygenase enzymes but the DAS products are not genetically engineered to produce monooxygenase enzymes.

**A.** The district court construed the claim term "biological activity of 2,4-D monooxygenase" according to the undisputed meaning of the

terms the drafters chose.  The patent system depends on using language to describe the invention claimed.  Here, Dr. Streber and the other applicants decided to write a claim based on a guess that *tfdA* encodes a "monooxygenase."

It is undisputed that a monooxygenase is "an enzyme that utilizes molecular dioxygen, $O_2$, as a cosubstrate to catalyze a reaction that causes one oxygen atom to be incorporated into a product other than water and converts the second oxygen atom to water."  It is likewise undisputed that *tfdA* encodes a dioxygenase, that is, "an enzyme that utilizes molecular dioxygen … as a cosubstrate to catalyze a reaction that causes both atoms of oxygen to be incorporated into products other than water."

Contrary to Bayer's repeated assertions, the "mistake" of choosing to draw its claims to genes encoding a "monooxygenase" was not simply an error in "scientific name."  Instead, the difference between monooxygenases and dioxygenases reflects fundamentally distinct biological activity.  As the district court recognized, the previously unverified assumption that TfdA was a monooxygenase, which Bayer embraced, "was not based on a misunderstanding of what it meant to be

a monooxygenase." Then, as now, monooxygenase "had a specific
meaning to persons of ordinary skill in the art … (just as did
dioxygenase and hydroxylase)." "[T]he inventors deliberately chose the
term monooxygenase."

**B.**  Bayer's challenge to the district court's claim construction
depends on distorting the patent and this Court's claim construction
doctrines.

Bayer asserts "[i]t is incorrect to construe claims" in a way "that
would produce the 'nonsensical result' of not covering a preferred
embodiment and would render dependent claims 'meaningless.'" But
there is nothing nonsensical about holding the Bayer patent applicants
to the meaning of the term they repeatedly chose to include throughout
their patent.

Bayer argues that the patent includes an "express definition of
biological activity" to mean "bringing about the cleavage of the side
chain of 2,4-D." Bayer relies almost entirely on the phrase "the tfdA
gene codes for 2,4-D [monooxygenase], a polypeptide having the
biological activity of bringing about the cleavage of the side chain of 2,4-
D." But, as the district court noted, this statement "merely *describes*

the key function of the enzyme at issue"—it is a simple explanation of

*one* effect of the reaction catalyzed by a 2,4-D monooxygenase.

**II.** The parties agree that this Court is free to construe the term

"a DNA sequence encoding a polypeptide." The description of the

"present invention" in the patent and the patent's prosecution history

establish that it discloses, at most, an invention that involves the *tfdA*

gene.

To ensure that the claims of a patent do not exceed what the

specification teaches the public, this Court construes claims in light of

the invention actually disclosed. Here, the '401 patent makes plain that

every aspect of the invention uses the *tfdA* gene. This is clear from the

very first words of the "Background of the Invention":

> The ***present invention*** relates to the production, by genetic engineering, of plasmids and bacterial strains ***containing the gene tfda, or a gene essentially identical to tfda***, on a short, exactly characterizable DNA segment.

A50, col. 1:11-14 (emphasis added). In keeping with that opening

description, throughout the '401 patent, Bayer repeatedly characterized

its "invention" as consisting of the *tfdA* gene or a modification of the

*tfdA* gene.

The invention here is not *any* DNA sequence that leads to *any* 2,4-D-degrading polypeptide. Rather, it is the specific DNA sequence of the *tfdA* gene that leads to the TfdA enzyme.

**III.** As construed by Bayer, the '401 patent is invalid for lack of an adequate written description. Bayer's patent does not satisfy any of the accepted ways of describing a genus of genes. *See Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1350 (Fed. Cir. 2010) (en banc). Bayer does not dispute that its proposed construction results in a "claim[] [to] a broad genus of genes based on function." "Bayer has not disclosed structural features common to members of its claimed genus." Bayer has not "disclosed a representative number of genes; it has instead only disclosed a single gene." Indeed, Bayer's expert, Dr. Matthysse, stated that it would have been *impossible* to disclose a correlation between the structure and function of genes falling within the claimed genus given the knowledge at that time.

Bayer's "growth test" cannot describe the broad class of claimed genes. The Court has emphasized that a "'wish' or 'plan' for obtaining the claimed DNA" is not sufficient. *Ariad*, 598 F.3d at 1350. No matter how "simple" Bayer might find the growth test described in the patent,

24

it amounts to no more than a plan for isolating genes with that

function.  Disclosure of a single DNA sequence in combination with a

growth test is not sufficient to satisfy the written description

requirement for a claim to a broad genus of such sequences.

## STANDARD OF REVIEW

This Court reviews claim construction as a matter of law,

"exercis[ing] independent review," but "[it] do[es] not start from

scratch[.]  [R]ather, [it] begin[s] with and carefully consider[s] the trial

court's work."  *Key Pharms. v. Hercon Labs. Corp.*, 161 F.3d 709, 713

(Fed. Cir. 1998).

The decision to "admit and use" extrinsic evidence, including,

among other things, expert testimony and dictionary definitions is

committed to the "sound discretion" of the district court.  *Phillips*, 415

F.3d at 1317-19.

A district court's grant of summary judgment is reviewed without

deference.  *TechSearch LLC v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed.

Cir. 2002).  "Compliance with the written description requirement is a

question of fact but is amenable to summary judgment in cases where

no reasonable fact finder could return a verdict for the nonmoving

party." *PowerOasis, Inc. v. T–Mobile USA, Inc.*, 522 F.3d 1299, 1307 (Fed. Cir. 2008).

## ARGUMENT

There are three separate grounds on which to affirm the district court's decision. First, as the district court correctly ruled, the asserted claim is to genes encoding a "monooxygenase" and it is undisputed that the accused products have not been genetically engineered to produce monooxygenases. Second, the "present invention" in the patent involves the *tfdA* gene and it is undisputed that the accused products do not include the *tfdA* gene. Third, as the district court concluded, if Bayer's proposed construction of claim 1 is adopted, the patent is invalid for failure to adequately describe the claimed invention.[7] The district court should be affirmed.

---

[7]    This Court, of course, cannot adopt all of these positions simultaneously. For example, if the patent covers only genes encoding 2,4-D monooxygenases, it cannot cover *tfdA*, which encodes a dioxygenase. And if the patent covers only *tfdA*, it cannot cover all genes encoding 2,4-D monooxygenases. But DAS prevails if the Court adopts any one of these three positions.

I.   **BAYER'S PATENT COVERS ONLY GENES ENCODING 2,4-D MONOOXYGENASES**

The district court's construction of "biological activity of 2,4-D monooxygenase" adheres to the ordinary and customary meaning of the "monooxygenase" limitation Bayer chose to write.  *See* Point I.A.  None of the critiques Bayer offers are persuasive.  *See* Point I.B.

A.   **The District Court Construed "Biological Activity Of 2,4-D Monooxygenase" According To The Undisputed Meaning Of The Term The Applicants Chose**

The patent system depends on using language to describe the invention claimed.  *See Phillips*, 415 F.3d at 1312 ("It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'") (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("[W]e look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention.").  As the district court correctly stated, "[i]n construing a claim, courts … afford the words of a claim the 'ordinary and customary meaning' they would 'have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective

filing date of the patent application.'" A12 (quoting *Phillips*, 415 F.3d at 1312-13).

Here, Bayer's researchers chose to write a broad claim based on a guess about the function of the gene they were studying. The chosen words have a long-settled meaning, and the chosen words convey a particular enzymatic mechanism. The district court properly construed the words to mean what they have always meant and mean today.

> **1.    Dr. Streber and the other applicants chose to claim all genes that code for enzymes with the "biological activity of 2,4-D monooxygenase."**

When Dr. Streber and the other applicants sought patent protection for their research relating to *tfdA*, they needed to write a claim that covered the gene. They had several options:

They could have written a claim expressly limited to the *tfdA* gene. But, evidently, the applicants wanted to try to gain a broader scope of protection.[8]

---

[8]    As discussed below at 53-61, no matter the ordinary meaning of the terms in claim 1, the claims cannot reach beyond the *tfdA* gene that was disclosed in the invention.

Or, using the language from the specification that Bayer now wants to import into the claims, they could have claimed a gene sequence that encodes a polypeptide which "bring[s] about the cleavage of the side chain of 2,4-D," A50, col. 2:25-27.

Or, they could have limited the claimed invention to genes encoding "hydroxylase" enzymes that degrade 2,4-D.[9] "Hydroxylase" was, and is, the appropriate term "when you know it's a hydroxylation, but you don't know if it's a … monooxygenase doing it or a dioxygenase." A10,908. It was the well-established and technically correct "catch-all" term that covered any enzyme, whether mono- or dioxygenase, that brings about side-chain cleavage. A10,907-08; *see also* A19-21; A10,810. Tellingly, the first draft of Dr. Hausinger's expert declaration used the term "hydroxylation" to refer to the

---

[9]    Even if the applicants had used the term "hydroxylase," however, the written description would be insufficient to support the claim. *See infra* at 61-72.

enzymatic activity of *tfdA*.[10]  But the applicants did not claim genes encoding enzymes with the biological activity of 2,4-D hydroxylase.

Yet another option was to reach a better understanding of the way the gene and its corresponding enzyme worked.  In the mid-1980s, there was an unverified assumption—a "guess[]," A10,932—in the art that TfdA was a 2,4-D monooxygenase.  *See* OB 4.  Indeed, prior to filing the patent application, Dr. Streber had attempted to confirm whether TfdA behaves as a 2,4-D monooxygenase would.  *See* A13,481; A13,591-92.  As the district court concluded after hearing evidence from the expert witnesses, the results of Dr. Streber's experiment "should have suggested to [Dr. Streber] that classification of the TfdA enzyme as a monooxygenase was erroneous."  A8, n.4.[11]  Bayer asserts (OB 46) that

---

[10]    At the suggestion of Bayer's attorneys, Dr. Hausinger changed the declaration to refer to "monooxygenation" because it would "connect[] better to the point of this whole litigation."  A7034.

[11]    Bayer suggests that the knowledge of enzymatic mechanisms is from a "different scientific field," and microbiologists such as Dr. Streber cannot be expected to understand such matters.  OB 7.  The distinction between monooxygenases and dioxygenases, however, is set forth in undergraduate biochemistry textbooks.  A13,315-43; A13,344-49; A2952, A2953-54, A2956.  Dr. Streber recognized the importance of the enzymatic mechanism and its necessary factors in his declaration submitted to the PTO, which discussed "2,4-D monooxygenase

Dr. Streber's experiments are irrelevant because he did not conduct them before the "effective filing date" of the '401 patent. But the experiments were conducted no later than the date the dissertation was published in January 1987, and, as a practical matter, were presumably conducted many months earlier.[12] The original patent application was filed August 28, 1987, and the "biological activity of 2,4-D monoxygenase" claim limitation first appeared in a 1989 continuation-in-part. *See* A32; A1032. Regardless of what Bayer means by "effective filing date," Dr. Streber's experiments were done before then.[13]

In sum, as the district court recognized, had the inventors not wanted to limit their claims based on enzymatic activity, they easily

---

enzymatic activity" and stated that "[i]t was not known whether there were additional factors ... the presence (or absence) of which were required for enzymatic activity." A1849.

[12] The dissertation states: "Within the scope of the experimental parts I [Dr. Streber] was at the Institute for Microbiology in the working group of Prof. Dr. A. Böck from June 1984 to December 1984, and from June to November 1985 I spent a research stay with Prof. Dr. K. N. Timmis in the department for Medical Biochemistry at the Geneva University." A13,609.

[13] Bayer has suggested that the effective date of the '401 patent application is August 1986 in light of a German application, *see* A1032; A1091. But the German application claimed only *tfdA*; there is no equivalent to the "biological activity of 2,4-D monoxygenase" claim at issue here. A1092-94.

could have avoided doing so using different language that more accurately reflected the existing knowledge (or lack thereof) regarding how TfdA operates.  A18-19 (discussing claiming options).

But instead of describing what they knew, Dr. Streber and the other applicants decided to rely on guesswork:  they elected to write a claim based on the activity of a "monooxygenase" even though, as Bayer admits (OB 47), Dr. Streber himself remarked that "little can be said on the mechanism of the side chain cleavage," A13,591.

> **2.    It is undisputed that a "monooxygenase" is an enzyme where "one atom of oxygen … ultimately forms water."**

Everyone agrees that the chosen word, "monooxygenase," refers to "an enzyme that utilizes molecular dioxygen, $O_2$, as a cosubstrate to catalyze a reaction that causes one oxygen atom to be incorporated into a product other than water and converts the second oxygen atom to water."  A10,861 (DAS's expert); *see also* A7010 (Bayer's expert).  And everyone agrees that a dioxygenase, by contrast, is "an enzyme that utilizes molecular dioxygen … as a cosubstrate to catalyze a reaction that causes both atoms of oxygen to be incorporated into products other

than water." A10,861-62 (DAS's expert); *see also* A7012 (Bayer's expert).

The experts also agreed that this distinction between mono- and dioxygenases had been established for decades by the time the '401 patent was filed. *See* A19. During his deposition, Dr. Hausinger testified that the difference has been known for "over 50 years." A7012; *see also* A10,809. DAS's expert, Dr. Martin Bollinger, agreed. A10,862.

Bayer does not now dispute that these definitions, which were adopted by the district court, are right "in general." OB 8. It agrees, in particular, that a "textbook 'monooxygenase'" would, in this case, "add[] one atom of oxygen to 2,4-D and use[] the other to make water." OB 9.

But Bayer repeatedly asserts (*e.g.*, OB 37-38), that the term "monooxygenase" is simply a "scientific name," *Schering Corp. v. Amgen Inc.*, 222 F.3d 1347, 1353 (Fed. Cir. 2000), a mere matter of "nomenclature," or what an enzyme "was called." It is not.

"[T]he inventors deliberately chose the term monooxygenase." A22.[14] As the district court recognized, the previously unverified

---

[14]    Bayer notes that the specification consistently refers to "2,4-D monooxygenase" rather than just "monooxygenase." OB 31-32. But

assumption that TfdA was a monooxygenase, which Bayer embraced, "was not based on a misunderstanding of what it meant to be a … monooxygenase." A18.  At the time, monooxygenase "had a specific meaning to persons of ordinary skill in the art … (just as did dioxygenase and hydroxylase)." *Id*.  That meaning has not changed.

The distinction between monooxygenases and dioxygenases distinguishes between distinct biological activities.  To trigger the cleavage of 2,4-D's side chain, a monooxygenase that degrades 2,4-D requires a cosubstrate in addition to an oxygen molecule and 2,4-D.  That cosubstrate is either the molecule NADH or the molecule NADPH.  *See* A5212-21; A5364.[15]  Thus, the reaction facilitated by 2,4-D monooxygenase can be depicted schematically as follows:

---

that is simply the normal way in which a monooxygenase that acted on 2,4-D would be described.  For this reason, *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp*, 587 F.3d 1339, 1347 (Fed. Cir. 2009), is not relevant here.  There is no indication in the '401 patent specification that "monooxygenase" or "2,4-D" is being used as a "modifier," thus fundamentally changing its meaning, *id*. at 1347, or that the plain meaning of "monooxygenase" rendered either term "redundant," *id*. at 1348.

[15]    Dr. Streber's experiments, discussed above, showed that TfdA does *not* consume NADH.  A13,591-92; *see also* A10,886.



In contrast, the reaction caused by TfdA requires a cosubstrate called alpha-ketoglutarate (αKG), rather than NADH, and does not result in any oxygen atom ending up in water.  *See* A5213-14; A4133-34. The reaction can be schematically depicted as follows:



In 1993, Dr. Hausinger published his research pointing out that "2,4-D monooxygenase … was not a monooxygenase," but rather "was carried out by [a] … dioxygenase type of mechanism."  A7010.  Indeed, "any enzymologist that would be interested in the real chemistry of the enzyme should understand that the enzyme" is a dioxygenase.  A7030.

## B.    There Is No Legitimate Reason To Depart From The Settled Understanding Of "Monooxygenase"

Bayer's effort to convert its description of a single gene (*tfdA*) into a patent on a broad class of genes, *see infra* at 61-72, depends on distorting the patent and this Court's claim construction doctrines.  Bayer invokes (OB 39-41) the doctrine that claims should be construed

to include the preferred embodiment.  But this is a classic case where the plain language of the claim overrides that presumption.  Bayer puts great emphasis on the idea that the specification "defines the 'biological activity of 2,4-D monooxygenase' as 'bringing about the cleavage of the side chain of 2,4-D.'"  OB 33 (quoting A50, col. 2:25-27).  But the patent provides no such definition.  And Bayer somehow finds fault with the district court's careful *Markman* proceeding, a proceeding that confirmed what remains undisputed:  monooxygenase does not mean dioxygenase.

## 1.    The "only possible" construction excludes the preferred embodiment.

Bayer asserts "[i]t is incorrect to construe claims" in a way "that would produce the 'nonsensical result' of not covering a preferred embodiment and would render dependent claims 'meaningless.'"  OB 40 (quoting *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1362-63 (Fed. Cir. 2008)).  The only disclosed embodiment is *tfdA*. There is no dispute that the DAS products do not use *tfdA*.  A24; A6067-68.

But the district court correctly determined that "'the only possible interpretation of the claim' terms at issue is the one that" excludes *tfdA*.

A22 (quoting *Ortho-McNeil*, 520 F.3d at 1362).  It is true, as the district court recognized, that correct claim constructions "'rarely'" "'operate to exclude the preferred embodiment,'" A16 (quoting *Lacks Indus., Inc. v. McKechnie Vehicle Components USA, Inc.*, 322 F.3d 1335, 1356 (Fed. Cir. 2003) (Clevenger, J., dissenting in part)),[16] and that "courts generally 'strive[] to reach a claim construction that does not render claim language in dependent claims meaningless,'" A22 (quoting *Ortho-McNeil*, 520 F.3d at 1362).  But "rarely" does not mean "never."  The goal of avoiding the exclusion of a preferred embodiment or rendering a dependent claim meaningless must yield to the most fundamental principle of claim construction:  that a patent must be interpreted "as written, not as the patentees wish they had written it."  *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004).

---

[16]    Bayer relies on Judge Clevenger's dissent in *Lacks* (OB 41), that reads:  "[S]uch a conclusion can be mandated by clear intrinsic evidence, *such as 'unambiguous' claim language*."  332 F.3d at 1356 (emphasis added) (citation omitted).  In *Lacks*, there was a "quite explicit" intrinsic definition that, Judge Clevenger found, excluded the preferred embodiment.  *Id.*  Here, the unambiguous understanding in the art of "monooxygenase" mandates adhering to the plain language of the claim term even under the dissenting opinion Bayer relies on.

So although courts "normally do not interpret claim terms in a way that excludes embodiments disclosed in the specification," where, as here, "those embodiments are clearly disclaimed in the specification … or prosecution history," this Court *has* often "interpreted claims to exclude embodiments of the patented invention …." *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276-77 (Fed. Cir. 2008) (citations omitted).

For example, in *Elekta Instrument S.A. v. O.U.R. Scientific International, Inc.*, 214 F.3d 1302 (Fed. Cir. 2000), the patentee argued that its patent covered gamma units with radiation sources and beam channels between 0° and 45°, as depicted in the preferred embodiment. *Id.* at 1306-7.   But the first claim of the patent recited gamma units with radiation sources and beam channels "'only within a zone extending between latitudes 30°– 45° ….'" *Id.* at 1304.  "[A]ccord[ing] the claim language its ordinary meaning," this Court held that "claim 1 is susceptible of only one reasonable construction, and is limited to gamma units with radiation sources located exclusively between 30°-45°," the preferred embodiment notwithstanding.  *Id.* at 1307-8; *see also Lucent Techs., Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1215-1216 (Fed. Cir. 2008) ("[W]here we conclude that the claim language is unambiguous,

we have construed the claims to exclude all disclosed embodiments.");

*Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1383-84

(Fed. Cir. 2008) (excluding preferred embodiment from claim scope); *N.*

*Am. Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1345

(Fed. Cir. 2005) (same).

In contrast to the routine cases, where "it is unlikely that an

inventor would define the invention in a way that excluded the

preferred embodiment," here there "is highly persuasive evidentiary

support" that the inventors of the '401 patent unambiguously did

exactly that. *Vitronics*, 90 F.3d at 1583-84 (internal quotation marks

and citation omitted). Because Bayer assumed, without verifying, that

TfdA was a monooxygenase and chose language reflecting that

assumption, it disclaimed coverage of any 2,4-D degrading enzyme that

was *not* a monooxygenase. *See supra* at 28-32. It purposefully chose to

claim only those genes encoding enzymes that have "the biological

activity of 2,4-D monooxygenase." A65, col. 32:12-14.

In addition to including that limitation in the language of claim 1,

during the patent's prosecution Bayer embraced the understanding,

shared by the Examiner, that its invention was limited to

40

monooxygenases. *See supra* at 15 n.6. When Bayer argued that its claims were nonobvious—thereby saving its patent application from rejection—Bayer did not argue that the claimed invention was unique because all enzymes that cleaved the side chain of 2,4-D were unique. Rather, Bayer focused on the unique nature of monooxygenase genes. *See, e.g.*, A4517 (asserting that prior to the '401 patent application "there had been no publication of any results regarding the expression of either a bacterial monooxygenase or any other comparable enzyme in plants"). And after the PTO told Bayer it could not have claims covering both monooxygenase genes and other genes in the same patent, Bayer elected to pursue only claims that the Examiner noted were "*drawn to a 2,4-D monooxygenase gene*." A5185 (emphasis added); *see also* A5283-85. This "provides evidence of how the PTO and the inventor understood the patent" and thus "inform[s] the meaning of the claim language …." *Phillips*, 415 F.3d at 1317.

Indeed, this Court will not rewrite claims even if, unlike here, the words were *accidentally* included in the claim. In *Chef America*, 358 F.3d 1371, the claim at issue described five steps for making dough, one of which was "heating the resulting batter-coated dough ***to*** a

temperature in the range of about 400º F. to 850º F. for a period of time ranging from about 10 seconds to 5 minutes …." *Id.* at 1372 (emphasis added). But, as one might guess, complying with the claim as written would mean the dough "would be burned to a crisp." *Id.* at 1373. This Court nevertheless refused "to interpret the claim as if it read 'heating the … dough *at* a temperature ….'" *Id.* at 1373-74 (emphasis added). The Court explained that "'[w]here, as here, the claim is susceptible to only one reasonable construction, the canons of claim construction cited by [patentee] are inapposite, and we must construe the claims based on the patentee's version of the claim as he himself drafted it.'" *Id.* at 1374 (citations omitted).

Here, of course, there is nothing "nonsensical" about holding Bayer's researchers to their deliberate choice to rest their claim on guesswork.

For these reasons, Bayer's analogy to Pluto misses the point. Bayer contends that under the logic of the district court's decision "a patent claim term 'planet' that issued from an application filed in 1986 must exclude the celestial object then known as 'planet Pluto.'" OB 59-60. Not so. Pluto is no longer considered a planet because in 2006

42

astronomers adopted an official definition of "planet" which requires

characteristics that Pluto does not possess.[17]   Under the logic of the

decision below, a 1986 patent that refers to "planets" would be

construed to include Pluto according to the definition at that time.   That

makes sense.   Here, however, the relevant definition has not changed:

"monooxygenase," unlike "planet," means today what it meant in 1986.

> **2.    The patent does not define monooxygenase as any enzyme that "cleaves the side chain."**

The linchpin of Bayer's argument on appeal is the assertion that

the patent includes an "express definition of biological activity" to mean

"bringing about the cleavage of the side chain of 2,4-D."  OB 6, 9, 10, 17-

18, 27, 28, 31, 33, 34.  But one searches the patent in vain for any such

definition.

Zeroing in on a single phrase, Bayer relies almost entirely on the

following statement: "The tfdA gene codes for 2,4-D [monooxygenase], a

polypeptide having the biological activity of bringing about the cleavage

of the side chain of 2,4-D; therefore, the ability to inactivate 2,4-D can

---

[17]    *See* Steven Soter, *What Is A Planet?*, Scientific American, Dec. 16, 2006, *available at* www.scientificamerican.com/article.cfm?id=what-is-a-planet.

be transferred, with the aid of the gene obtained from bacteria, to all those plants lending themselves to such manipulation by genetic engineering." A50, col. 2:25-31.  This statement cannot begin to bear the weight Bayer places on it.

As the district court put it, this statement "merely *describes* the key function of the enzyme at issue." A18  It is a simple explanation of *one* effect of the reaction catalyzed by a 2,4-D monooxygenase.  The fact that 2,4-D monooxygenase "ha[s]" certain biological activity does not mean everything with that biological activity is a 2,4-D monooxygenase.  Stating, for example, that an automobile has the activity of consuming gasoline is not the same thing as stating that everything that consumes gasoline is an automobile.  But that is the implausible construction urged by Bayer:  it reads the statement that 2,4-D monooxygenase cleaves the side chain of 2,4-D to mean that anything that cleaves the side chain of 2,4-D is a monooxygenase.

If anything, the statement emphasized by Bayer confirms the importance of construing the claim as limited to monooxygenases.  The "bringing about" language indicates that *how* the enzyme cleaved the side chain—its mechanism—mattered, not that it was irrelevant.

44

Because the difference in how monooxygenases and dioxygenases "bring about" side-chain cleavage was well known when the patent was filed, *see supra* at 32-36, any inventor who possessed a dioxygenase would have had no reason, based on anything in the '401 patent, to think that the enzyme was claimed by the patent.

Bayer seeks refuge in the "biological activity" portion of the phrase.  OB 34-35.  But that portion of the phrase provides no help. There was no dispute among the parties' experts regarding the meaning of "biological activity."  DAS's expert, Dr. Bollinger, explained that the "biological activity" of an enzyme means the *entire* reaction catalyzed by that enzyme, including the conversion of both substrates into products. *See* A10,874-75.  Any type of enzyme has biological activity; the phrase does not identify the enzyme.  Dr. Hausinger confirmed that the term the "enzymatic activity" of a "dioxygenase or monooxygenase" "is part of the biological activity" "[w]hen it's inside the cell …."  A10,779; *see also* A10,775 ("The biological activity is the larger activity that within it there is some enzyme activity, but you don't always know what that enzyme activity is.").  He explained that "the overall activity of the enzyme" includes "the set of substrates that are converted to the set of

products," A10,777—in other words, "you are looking at all of the substrates, all of the products from that enzyme," A10,774; *see also* A10,778 ("That is the overall activity in terms of this total substrates and the total products ...."); A11,322-23 (Dr. Matthysse, another Bayer expert, testified that "biological activity" means "it has an activity in a biological system, the activity which is seen in a biological system").[18]

By limiting "biological activity" to only the cleavage of the side chain, Bayer's proposed construction results in a claim that would cover genes encoding a vast number of different types of enzymes—"whether a monooxygenase [gene], dioxygenase gene, or other gene" that encodes neither type of enzyme.  A18; *see* A10,797 (Dr. Hausinger testifies that there are enzymes that turn 2,4-D into 2,4 dichlorophenol where "there's no oxygen"); A10,904 (Dr. Bollinger, testifying identically). Because the specification, like the claim, focuses on "2,4-D monooxygenase," such a construction should be rejected.  *See Phillips*,

_____

[18]    Dr. Streber employed the same understanding of "enzymatic activity" in a declaration submitted to the PTO.  *See* A1849 (discussing "enzymatic activity in E. coli cells" and factors "inside bacterial cells" that were "required for enzymatic activity").

415 F.3d at 1313 (claim terms are read "in the context of the entire patent, including the specification").

The inclusion of the "growth test"—or complementation assay—in the specification does not change the analysis. As the district court explains, the "growth test" involved the following steps: "(1) creat[e] a mutant strain of Alcaligenes bacteria that lacked 2,4-D resistance; (2) transfer[] segments of DNA [from the prior art plasmid] of the non-mutant, 2,4-D resistant Alcaligenes bacteria into the mutant; [and] (3) test[] whether the transfer resulted in 2,4-D resistance for the previously vulnerable mutant." A7. According to Bayer, the "growth test" was "guaranteed to identify *only* genes encoding 2,4-D side-chain-cleaving enzymes," and "[t]he correct 'biological activity' can be *only* that which was known and recited in the patent." OB 42-43. But the test was designed to locate the "2,4-D monooxygenase **coded by** *tfdA*," in particular. A62, col. 25:14-19 (emphasis added); *see also* A11,004 (Bayer's expert agrees that no genes "obtainable with the complementation assay" are "disclosed in the patent[] other than *tfdA*"); *infra* at 58-60. Ironically, Bayer's attempt to expand the import of the growth test beyond *tfdA* depends on exactly the type of extrinsic

evidence it faults the district court for consulting. *See* OB 53-56 (relying on expert testimony). But regardless, the growth test as disclosed in the patent does not communicate an understanding that any enzyme that cleaved the side chain of 2,4-D was a 2,4-D monooxygenase nor does it communicate an understanding that cleavage of the side chain was the *sole* activity of a 2,4-D monooxygenase.

Bayer also points to various articles that purportedly demonstrate that "[s]ide-chain-cleaving enzymes" were also called "'2,4-D monooxygenases' or 'TfdAs.'" OB 20, 35. But these articles just confirm that at the time the patent was filed there was an "art-accepted" assumption that TfdA was a monooxygenase. OB 35. None of the evidence Bayer points to indicates that it was commonly understood that cleavage of the side chain was the *only* biological activity of TfdA, or any other 2,4-D monooxygenase.

Bayer asserts (OB 35) that this Court's "lexicographer" case law "does not apply here" because Bayer is not attempting to redefine a term "*contrary* to an accepted art meaning." But Bayer is doing just that by reading monooxygenase to mean something other than what all

the experts agreed it means.  If a patentee wants to set forth a unique definition, it must do so with "'clarity, deliberateness, and precision ....'" *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998) (citation omitted).  The "special meaning" the patentee wishes the court to adopt must be "sufficiently clear in the specification that any departure from common usage would be so understood by a person of experience in the field of the invention." *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998).  Other than repeat the fiction that it expressly defined monooxygenase, *see supra* at 43-47, Bayer makes no effort to show that it can meet the high bar of redefinition set out in this Court's cases.

   *Sanofi-Aventis Deutschland GmbH v. Genentech, Inc.*, 473 F. App'x 885 (Fed. Cir. 2012), a case on which Bayer relies (OB 38), does not suggest otherwise.  There, this Court limited the term "plasmid" to a "circular, extrachromosomal molecule," even though the term typically includes both circular and linear forms, because the patent from which the claims were copied explicitly defined a "plasmid" to be "a closed ring." *Id.* at 891-92.  Here, the '401 patent specification nowhere states

that the biological activity of 2,4-D monooxygenase is defined as cleavage of the side chain of 2,4-D.

### 3. The district court did not abuse its discretion in holding a *Markman* hearing.

Bayer complains (OB 31-32) that the district court "construed the claims using exclusively *extrinsic* evidence," and criticizes the *Markman* hearing as "atypical and lengthy." OB 13.

To the extent Bayer's argument is premised on the fiction that the patent includes an express definition of "biological activity of a 2,4-D monooxygenase" (*e.g.*, OB 31), that argument is refuted above at 43-50.

And to the extent Bayer's argument rests on the notion that there was something improper in the district court's hearing and evaluation of relevant expert testimony, the argument is meritless. This Court has made it clear that "there is no magic formula or catechism for conducting claim construction," and courts are not "barred from considering any particular sources or required to analyze sources in any specific sequence, as long as those sources are not used to contradict claim meaning that is unambiguous in light of the intrinsic evidence." *Phillips*, 415 F.3d at 1324; *see also Vitronics*, 90 F.3d at 1584 (use of

extrinsic evidence is proper so long as it does not "vary or contradict the claim language" or "the import of other parts of the specification").

The proceeding the district court conducted in this case is a model of how courts should approach the construction of claims in scientific cases. It is the rare trial judge who would understand recombinant DNA technology or know the meaning of "monooxygenase." Because "'it cannot be expected … that judges will always possess the requisite knowledge of the meaning of the terms of art or science used in letters patent, it often becomes necessary that they should avail themselves of the light furnished by experts relevant to the significance of such words and phrases.'" *Markman,* 517 U.S. at 387 (quoting A. Walker, Patent Laws § 189, at 173 (3d ed. 1895)); *see also Phillips*, 415 F.3d at 1314 ("Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent," a court may properly look to "extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." (internal quotation marks and citations omitted)). Allowing the parties to present experts from the field to explain the relevant technology and terminology is not only sensible, it is also routine. *See DESA IP, LLC v.*

*EML Techs., LLC*, 211 F. App'x 932, 934 (Fed. Cir. 2007) (describing a "three-day Markman hearing, during which multiple experts for both sides testified"); *EMI Grp. N. Am., Inc. v. Intel Corp.*, 157 F.3d 887, 892 (Fed. Cir. 1998) (describing the "extensive testimony from the technical experts").[19]

\*    \*    \*

Bayer did not correctly describe nor claim what it now says it invented. As between the public and Bayer, the consequences of Bayer's decision to write its claims on the basis of a guess must be placed on Bayer. To do otherwise is to eviscerate the "public notice function of patents." *Phillips*, 415 F.3d at 1319. The district court's construction of "biological activity of 2,4-D monooxygenase," and its resulting grant of summary judgment of noninfringement, should be affirmed.

---

[19]    *See also Phillips*, 415 F.3d at 1332 (describing *Markman* hearings as "often longer than jury trials") (Mayer, J., dissenting); *Data Gen. Corp. v. IBM Corp.*, 93 F. Supp. 2d 89, 91 (D. Mass. 2000) (holding a four-day *Markman* hearing).

## II.    BAYER'S INVENTION IS LIMITED TO *TFDA*

Because the district court's construction of "biological activity of 2,4-D monooxygenase" compelled a grant of summary judgment of noninfringement to DAS, the court "[did not] address" other "disputed claim limitations," including the claim 1 term "'a DNA sequence encoding a polypeptide.'"  A11.  The parties agree that this Court is nevertheless free to construe "a DNA sequence encoding a polypeptide," A65, col. 32:13.  *See* OB 49; *Bancorp Servs. LLC v. Sun Life Assurance Co. of Canada (U.S.)*, 687 F.3d 1266, 1274 (Fed. Cir. 2012) ("Although the district court declined to construe the claims, that does not preclude us from making that legal determination on appeal.").

The description of the "present invention" in the patent and the patent's prosecution history establish that it discloses an invention that involves the *tfdA* gene.  Thus, this Court should construe "a DNA sequence encoding a polypeptide" to require the *tfdA* gene.  Under that construction, the grant of summary judgment of noninfringement should be affirmed:  it is undisputed that DAS's Enlist™ products do not use the *tfdA* gene.

## A.    The Claims Should Be Limited To The *tfdA* Invention Disclosed In The Patent

To ensure that the claims of a patent do not exceed what the specification teaches the public, this Court construes claims in light of the invention actually disclosed.  *See, e.g., In re Rembrandt Techs., LP*, No. 2012-1022, 2012 WL 4017470, at *8 (Fed. Cir. Sept. 13, 2012); *Lydall Thermal/Acoustical, Inc. v. Federal-Mogul Corp.*, 344 F. App'x 607, 614 (Fed. Cir. 2009); *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007); *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318-19 (Fed. Cir. 2006); *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1348 (Fed. Cir. 2004).

Here, claim 1 does not expressly refer to the *tfdA* gene.  But the '401 patent makes clear that every aspect of the invention uses the *tfdA* gene.[20]  This is clear from the very first words of the "Background of the Invention":

> The ***present invention*** relates to the production, by genetic engineering, of plasmids and bacterial strains ***containing the gene tfdA, or a gene***

---

[20]    The specification also refers to *tfdA*'s "mutant."  A50, col. 2:52-57. Bayer agreed to drop these claims pursuant to a restriction requirement, A5184-89, A5281-87.

> ***essentially identical to tfda***, on a short, exactly
> characterizable DNA segment.

A50, col. 1:11-14 (emphasis added).  In keeping with that opening

description, throughout the '401 patent, Bayer repeatedly characterized

its "invention" as consisting of the *tfdA* gene, or a modification of the

*tfdA* gene, as follows (emphasis added):

- "It has now been possible for the first time thanks to ***the present invention*** to isolate, to clone, and to characterize the gene ***tfdA***."  A50, col. 1:59-61.

- "Another aspect of ***this invention*** relates to plasmids containing the gene ***tfda*** or genes ***substantially identical to tfda*** …."  A50, col. 2:63-64.

- "Among the thus-formed recombinant plasmids, the ***tfda-containing plasmids*** according to ***this invention*** can be identified by introducing the plasmids into bacterial strains from which then the ***tfdA-containing clones*** can be directly selected based on a ***tfda-conveyed ability***."  A51, col. 3:18-22.

- "The plasmids according to ***this invention*** can furthermore be prepared by subcloning from recombinant plasmids containing the gene ***tfda***."  A51, col. 4:39-41.

- "By subcloning DNA segments containing ***tfda***, those plasmids according to ***the invention*** can also be produced which differ in the type of plasmid vectors utilized, in dependence on the pursued target of usage."  A51, col. 4:61-64.

- "The plasmids according to ***this invention*** can furthermore evolve by modification from ***tfda-containing plasmids***."  A52, col. 5:62-63.

55

- "By deletion of DNA fragments from *tfda-containing plasmids* and, respectively, by subcloning DNA fragments, it is also possible to obtain further plasmids according to *this invention* which then merely contain parts of a *tfda* gene." A52, col. 6:27-30.

- "Cloned fragments containing *tfda or parts of tfdA* can serve for the detection of homologous DNA sequences and thus for finding *tfda* genes in other organisms. For this purpose, these fragments are excised from the plasmids of *this invention* with the aid of suitable restriction enzymes …." A52, col. 6:62-66.

The patent describes 2,4-D monooxygenase as "an enzyme catalyzing in many 2,4-D degrading organisms the first step in the metabolizing of 2,4-dichlorophenoxyacetic acid (2,4-D)." A50, col. 1:21-23. Bayer previously has read that statement to mean that the patent describes an invention other than the *tfdA* gene. But the evident purposes of the quoted language—from the second paragraph of the patent—is to put the invention in context by providing background information that various soil bacteria degrade 2,4-D. The next paragraph more specifically sets out the relevant context: "[T]hus far attempts have been unsuccessful regarding localizing of gene tfda." A50, col. 1:54-56. Unlike the numerous passages quoted above, the second paragraph of the patent does not purport to describe the patented invention, and thus cannot expand the scope of the invention.

56

Because Bayer's disclosure is so limited, this Court's case law compels a construction of "a DNA sequence encoding a polypeptide" to mean only the *tfdA* gene. In *Honeywell*, the Court construed the term "fuel injection system component" as limited to a fuel filter even though on its face the claim could cover other components, because the specification referred to a fuel filter as "this invention" or "the present invention." 452 F.3d at 1318. This Court concluded that "[t]he public is entitled to take the patentee at his word and the word was that the invention is a fuel filter." *Id*.

Here the phrase "DNA sequence encoding a polypeptide" reaches beyond the disclosed invention: DNA refers to the deoxyribonucleic acid cells use to store the information needed to assemble amino acids in the right order to create particular polypeptides. But the present invention here is not *any* DNA sequence that leads to *any* 2,4-D degrading polypeptide. Rather, it is the specific DNA sequence of the *tfdA* gene that leads to the TfdA enzyme. Just as *Honeywell* found that the description of the "present invention" required construing "fuel injection system component" to refer to a particular component, here the description of the invention requires construing "DNA sequence

57

encoding a polypeptide" to mean the *tfd*A sequence encoding the TfdA

enzyme.

## B.   The "Growth Test" Disclosed In The Patent Confirms That The Invention Relates To *tfdA*

It is clear from the specification that the inventors were describing

the growth test as a way to identify a "2,4-D monooxygenase ***coded by***

***tfdA***," in particular:

> This leads in case A (***tfda mutant***) to complementation of the mutation and thus to restoration of the wild-type property with respect to utilization of 2,4-D, i.e., strains are produced which are 2,4-D positive, growing on 2,4-D-minimal agar plates.  The ***2,4-D-mono-oxygenase coded by tfdA*** is ***furthermore*** capable of ....

A62, col. 25:14-19 (emphasis added).  The bolded phrases in the quoted

material confirm that the patent discloses the *tfdA* gene while the

inventors' use of the word "furthermore" makes clear that the prior

sentence is likewise discussing the enzyme "coded by tfdA."  *See* A7084

(1986 Webster's dictionary defining "furthermore" as "in addition to

what precedes").

Nevertheless, Bayer asserts that the purpose of the test disclosed

in the patent is to isolate "*virtually all* 2,4-D side chain cleaving genes."

OB 53.  But the growth test does not in fact isolate "virtually all" DNA

sequences that result in an enzyme that cleaves the side chain of 2,4-D. Bayer's expert, Dr. Alan Jones, stated that the test could not find animal, plant, or fungal genes. A11,057-58; A7119. Indeed, he admitted that he did not have "a clue" as to which soil bacteria genes the test could detect and which it could not. A11,058-60. Dr. Martin Yanofsky, DAS's expert, agreed, testifying that the growth test would not find genes found in plants, animals, and fungi, and that "it would [not] work [for] distantly-related microorganisms." A11,127-28.

Dr. Jones in fact admitted that the invention is limited to *tfdA*. At his deposition, counsel walked him through the growth test. Then, reading from the patent, counsel asked whether Dr. Jones would agree that "'[t]he present invention relates to the production, by genetic engineering, of plasmids and bacterial strains containing the gene tfdA or a gene essentially identical to tfdA on a short exactly characterizable DNA segment.'" A7131-32. After listening to this quote from the patent, Dr. Jones conceded that his idea of the invention as unrelated to *tfdA* is inconsistent with the "present invention" set out in the patent, testifying: "In light of what we just did, no. No, I mean it's any gene. You limited it to a gene." *Id.*; *see also* A11,009-10 (Dr. Jones confirms

that he testified that his understanding of what the patent calls "the invention" is inconsistent with what he was calling the "invention"); A11,011-12 (same); A11,091-92 (same).

## C. The Prosecution History Confirms That Claims Should Be Limited To The *tfdA* Invention Disclosed In The Patent

The prosecution history also supports the conclusion that the invention of the '401 patent is limited to *tfdA*. To be sure, when the inventors sought reconsideration of the examiner's decision to reject the claim for lack of enablement, (*see* 35 U.S.C. § 112), they referred to "isolation of 2,4-D monooxygenase from a large number of sources and by several methods." *See* A7176-77. But all of the sources and methods discussed by the inventors before the PTO involve the *tfdA* gene. For example, the inventors refer to "modification of *tfdA*-containing plasmids." *Id*. Similarly, the inventors refer to "cloning directly from a plasmid known to contain the gene" and cite to "page 7, first full paragraph" of the patent where the relevant text refers to "the cloned *tfdA* gene." *Id*.; *see also* A51, col. 4:32. No statement from the prosecution history refers to any gene other than the *tfdA* gene.

In short, the prosecution history only confirms what is plain from the face of the patent (including the growth test):  Bayer's invention is limited to the *tfdA* gene.

\*    \*    \*

The Court should affirm the district court's grant of summary judgment of noninfringement to DAS on the basis that all claims in the patent are limited to the *tfdA* gene.

## III.   AS CONSTRUED BY BAYER, THE '401 PATENT IS INVALID FOR LACK OF AN ADEQUATE WRITTEN DESCRIPTION

In *Ariad Pharmaceuticals*, this Court held that, in general, "an adequate written description requires a precise definition, such as by structure, formula, chemical name, physical properties, or other properties, of species falling within the genus sufficient to distinguish the genus from other materials."  598 F.3d at 1350.  *Ariad* confirms that where, as here, a patentee claims a genus of DNA sequences, an adequate written description requires "(i) … disclosure of structural features common to members of the genus, (ii) … disclosure of a representative number of genes, (iii) where the proposed claim is functional, as here, 'by functional characteristics coupled with

[disclosure of a] known or disclosed correlation between function and structure,' or (iv) by a combination of the above 'sufficient to show the applicant was in possession of the claimed genus.'"  A26 (citing, *inter alia*, *Ariad*, 598 F.3d at 1350).

Applying this law, the district court concluded that "even if [it] accepted Bayer's proposed construction [of claim 1] … Bayer's claim would fail as a matter of law" because "[t]he claim would not provide an adequate written description" as required by 35 U.S.C. § 112.  A30. That analysis is correct, and a familiar consequence of overly broad claims.  *See, e.g.*, *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 560 F.3d 1366, 1376-77 (Fed. Cir. 2009) ("[A]s it stands, Ariad chose to assert claims that are broad far beyond the scope of the disclosure provided in the specification of the … patent ….  'The motto, 'beware of what one asks for,' might be applicable here.'") (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1380 (Fed. Cir. 2007)), *vacated on other grounds by Ariad*, 598 F.3d 1336; *see also Eli Lilly & Co. v. Teva Pharms. USA, Inc.*, 619 F.3d 1329, 1344-45 (Fed. Cir. 2010) (patent invalid for failure to satisfy the written description requirement "[e]ven

though [the patentee] won on claim construction"); *Atlantic Research Mktg. Sys. v. Troy*, 659 F.3d 1345, 1355 (Fed. Cir. 2011) (same).[21]

### A. The Patent Does Not Disclose Structural Features Common To All Claimed Genes, Does Not Disclose A Representative Number Of Genes, And Does Not Disclose A Correlation Between Function And Structure

Bayer's patent does not satisfy any of the accepted ways of describing a genus of genes. Bayer does not dispute that its proposed construction results in a "claim[] [to] a broad genus of genes based on function." A26. The district court held that "despite claiming a broad genus of genes based on function, Bayer has not disclosed structural

---

[21] The district court entered a judgment denying DAS's written description motion as "moot" in light of its noninfringement finding. A30. "[T]he test for mootness is whether the relief sought would, if granted, make a difference to the legal interests of the parties …." *See Sys. Div., Inc. v. Teknek, LLC*, 298 F. App'x 950, 953 (Fed. Cir. 2008) (internal quotation marks and citation omitted). Because the district court ruled in DAS's favor on the written description issue, this Court can review that ruling. *See Devine v. Sutermeister*, 733 F.2d 892, 898 (Fed. Cir. 1984) ("A court should look to the substance of the litigation to determine whether an applicant has *substantially* prevailed in its position, and not merely the technical disposition of the case or motion.") *superseded on other grounds as discussed in Bowey v. West*, 218 F.3d 1373, 1377 (Fed. Cir. 2000); *De La Rosa v. Holder*, 598 F.3d 103, 108 (2d Cir. 2010) ("[r]emand is unnecessary if it would be pointless or futile"). Bayer also is of the view that the district court "found" the patent invalid, OB 11, and has fully briefed the written description issue. *See* OB 49-59.

Confidential Material
Omitted

features common to members of its claimed genus." *Id.*  The district

court also held that Bayer has not "disclosed a representative number of

genes; it has instead only disclosed a single gene." *Id.*  As the district

court noted, "Bayer disputes none of this." *Id.*

Figure 10 sets out a DNA sequence that contains the sequence of

the *tfdA* gene. *See* A40-44.  Bayer argues that ███████████████

███████████████████████████████████████████████████

███████████████████  OB 57-58.  That is incorrect; he in fact

specifically testified that ██████████████████████████████

██████████████████████  A8053.  Indeed, DAS's AAD enzymes only have

28% and 31% identity with TfdA, *see supra* at 18.  And there are in fact

potentially hundreds of enzymes that facilitate reactions resulting in

cleavage of the side chain of 2,4-D. *See* A4122-23.  But even assuming

for the sake of argument that the genes encoding *all* of those enzymes

are in some way "similar" to *tfdA*, the patent does not indicate *which*

regions of *tfdA*'s sequence are common to all of the group of genes

falling within the scope of the claims or which regions are related to

activity of the enzymes by their contributions to the claimed function.

*See* A11,346 (Bayer's expert agrees that the patent does not "reference … the conservation regions of the *tfdA* gene").

Nor was any correlation between sequence and function known in the art. Bayer suggests that at the time the patent was filed, "'relatively few organisms … were known … to degrade 2,4-D,'" and "persons of ordinary skill in the art … would have expected the … genes in these bacteria to be relatively similar to each other." OB 52. Of course, as construed by Bayer, the claimed genus is not limited to genes found in those "relatively few" organisms, nor does Bayer explain what "relatively similar" means. And in fact, Bayer's expert, Dr. Ann Matthysse, testified that "***[n]othing was known*** about" the "the area that you have to keep the same in order to do the enzymatic activity" of "the *tfdA* gene in 1986." A11,346 (emphasis added).

Bayer acknowledges that this Court held that the patent at issue in *Carnegie Mellon*, 541 F.3d 1115, failed to satisfy the written description requirement where, similar to here, "the specification disclosed one gene … from one bacteria, but claimed [the gene] from any bacteria." OB 51 (citing *Carnegie Mellon*, 541 F.3d at 1127). Attempting to distinguish *Carnegie Mellon*, Bayer suggests (OB 51) that

disclosure of a single sequence might nevertheless be sufficient in this case because, it asserts, the genus here is small and "homologous." Bayer's own witnesses refuted that notion, agreeing that the universe of enzymes that degrade 2,4-D is potentially both vast and diverse. *See infra* at 70-72. But even if Bayer's characterization were accurate, it would make no difference. The focus of the inquiry in *Carnegie Mellon* was not the size of the genus, but whether the disclosure of one DNA sequence was adequate to describe it. Where, as here, the relevant similarities among members of the genus cannot be discerned *at the structural level* on the basis of the patent's disclosure, the written description requirement is not satisfied, regardless of the size of the genus. As noted above, Bayer's own witnesses admitted that it would have been impossible to determine and describe "the necessary common attributes or features," 541 F.3d at 1124, of the claimed genes based solely on knowledge of *tfdA*'s sequence. *See* A11,346.

## B.    A "Growth Test" Is Not An Adequate Description Of Genes

Contrary to this Court's well-developed case law on what constitutes an adequate written description of genetic material, Bayer takes the position that a description of the DNA sequences included in

its claimed genus is not necessary to demonstrate possession of that genus. That is because, Bayer asserts, "knowledge of the DNA sequences used in the patent-in-suit's simple biological growth test is not required to ascertain side-chain-cleaving activity and to isolate the claimed genes from virtually any soil bacteria known to degrade 2,4-D." OB 51-52.

The district court properly rejected Bayer's suggestion that the growth test "satisfies the written description requirement" because it provides "a tool to identify other members of the class." A27. Regardless of whether there is a way, other than the three discussed above and identified by the district court, to describe "the DNA itself," the Court has made clear, time and again, that a "'wish' or 'plan' for obtaining the claimed DNA" is not sufficient. *Ariad*, 598 F.3d at 1350. No matter how "simple" Bayer might find the growth test described in the patent, and even if that test were capable of locating literally every single gene that cleaves the side chain of 2,4-D—which, as discussed below, it is not—it amounts to no more than an approach for isolating genes with that function. The growth does not describe the DNA sequences claimed.

This Court has held that the disclosure of a single DNA sequence in combination with a test to find additional species does not satisfy the written description requirement for a claim to the genus of sequences. For example, in *University of Rochester v. G.D. Searle & Co., Inc.*, 358 F.3d 916 (Fed. Cir. 2004), the patent included certain "nucleotide sequences" and "describe[d] in detail how to make [assays]" to identify other sequences that perform the same function (*e.g.*, "inhibit the expression or activity of the PGHS-2 gene product"). *Id.* at 927. This Court rejected the patent's claim to cover these other sequences: "As we held in [*Eli*] *Lilly*, '[a]n adequate written description of a DNA ... 'requires a precise definition, such as by structure, formula, chemical name, or physical properties,' not a mere wish or plan for obtaining the claimed chemical invention.'" *Id.* (quoting *Regents of the Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1566 (Fed. Cir. 1997), and *Fiers v. Revel*, 984 F.2d 1164, 1171 (Fed. Cir. 1993)); *see also Carnegie Mellon*, 541 F.3d at 1127 ("The additional expert statements relied upon by appellants, including statements concerning cloning techniques for purifying *polA* genes and experiments involving E. coli, were

immaterial to the relevant inquiry and thus do not raise genuine issues of material fact.").

Bayer attempts to ascribe significance to the fact that in *Carnegie Mellon*, 541 F.3d at 1125-26, "the disclosed method used to clone the exemplary gene could not be used to clone the other genes … because cloning … required knowledge of the promoter sequences of the claimed *polA* genes," whereas here "knowledge of the DNA sequences used in the … growth test is not required to ascertain side-chain-cleaving activity and to isolate the claimed genes from virtually any soil bacteria known to degrade 2,4-D." OB 51-52. That distinction is irrelevant. Whether or not it is possible to obtain the claimed genes without knowledge of their sequences, as discussed above, this Court has made clear that the disclosure of a plan for obtaining DNA is not sufficient to describe that DNA.

In view of these clear principles, Bayer's reliance on the growth test (OB 53-59) is entirely misplaced. So too is its emphasis on the "deposit of the mutant *Alcaligenes*." OB 50. A deposit of biological material containing recombinant DNA sequences can constitute a written description of those particular sequences. *See Enzo Biochem,*

*Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 964-65 (Fed. Cir. 2002); A27

("Bayer's reference to the mutant in the patent is sufficient to describe

the mutant itself."). But Bayer's mutant does not contain any DNA

sequences of particular genes within the claimed genus. Instead, the

mutant only made it possible for one of skill in the art to conduct the

growth test described in the specification. As the district court

concluded, this is not sufficient. "[E]ven if … the complementation

assay [growth test], in conjunction with the mutant, allows persons of

ordinary skill to 'routinely identify and obtain' members of the claimed

genus, it does not describe the members of the claimed genus, as

required to demonstrate Bayer's possession of the claimed subject

matter." A27.

### C.     There Is No Genuine Dispute That The "Growth Test" Disclosed In The '401 Patent Cannot Isolate A Large Number Of Genes That Degrade 2,4-D

Bayer attempts to manufacture a factual dispute about the growth

test's ability to identify all the genes that cleave the side chain of 2,4-D.

As the district court's written description opinion demonstrates, the

written description requirement is not met by even a comprehensive

"growth test." A plan is just not good enough.

Moreover, there is no dispute that the growth test cannot isolate large numbers of genes that cleave the side chain of 2,4-D.  2,4-D degrading activity is and was known to exist in bacteria, as well as in "eukaryotic" organisms such as plants,[22] fungi,[23] animals, and even humans.[24]  *See, e.g.,* A11,056; A10,798 (Dr. Hausinger agrees that "you can isolate 2,4-D degrading microorganisms from almost any environment," and that "in theory there could be billions that could degrade 2,4-D"); A10,797 (Dr. Hausinger testifies that "[t]here is a publication, at least one dealing with sewage sludge in which 2,4-D is metabolized to 2,4 dichlorophenol").  Bayer argues that the growth test can "isolate claimed genes from virtually any *soil bacteria*."  OB 53

---

[22]    The '401 patent acknowledges that "[m]etabolism of 2,4-D by several types of plants has been reported by various sources," A50, col. 2:9-10, and that Dr. Zenk, one of the inventors, had observed 2,4-D degradation in tobacco more than a decade before the application was filed, A50, col. 2:16-20.

[23]    2,4-D degradation has been known in eukaryotic fungi since at least 1964.  *See, e.g.*, A8026 (noting that it had been observed that "2,4-dichlorophenol" was the "main product").

[24]    Bayer's expert, Dr. Hausinger, discussed the presence of an enzyme in humans that is capable of degrading 2,4-D.  *See* A6907.

(emphasis added).[25]  But Bayer makes no attempt to limit its broad functional construction of claim 1 to only those side-chain-cleaving genes that are isolated from certain soil bacteria.  Bayer's careful use of semantics is a concession that the growth test undisputedly falls short of identifying all the genes falling within the proposed scope of claim 1.

## CONCLUSION

For the foregoing reasons, either the judgment of the district court should be affirmed or the Court should direct the entry of summary judgment of invalidity.

---

[25]    Each of the many experts Bayer cites (OB 53-55) addressed the growth test only in terms of a *soil bacterial* source.  *See* A11,056-59 (Dr. Jones testifying that the complementation assay would detect "over half" of the soil bacteria that could degrade 2,4-D, but would not detect animal genes, plant genes, eukaryotic genes, or fungal genes); A7584-85; A7699-7700; A7668-69; A10,796-98.

Dated:  February 19, 2013                Respectfully submitted,

                                         By: /s/ Mark S. Davies
                                         Mark S. Davies
                                         ORRICK, HERRINGTON &
                                           SUTCLIFFE LLP
                                         1152 15th Street, N.W.
                                         Washington, D.C. 20005
                                         (202) 339-8400

                                         *Attorney for Defendant-Appellee*
                                         *Dow AgroSciences LLC*

# CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2013, I caused the

nonconfidential version of the Answering Brief of Defendant-Appellee

Dow AgroSciences LLC to be electronically filed with the Clerk of the

Court using CM/ECF, which will automatically send email notification

of such filing to the following counsel of record:

Robert J. Koch, Esq.
Milbank, Tweed, Hadley &
   McCloy LLP
1850 K St. NW, Suite 1100
Washington, DC 20006

Travis Steven Hunter, Esq.
Richards Layton & Finger, PA
One Rodney Square
920 N. King Street
Wilmington, DE 19801

Respectfully submitted,

By: /s/ Mark S. Davies
*Attorney for Defendant-Appellee*
*Dow AgroSciences LLC*

## CERTIFICATE OF COMPLIANCE
## UNDER FEDERAL RULES OF APPELLATE PROCEDURE
## 32(a)(7) AND FEDERAL CIRCUIT RULE 32

Counsel for Defendant-Appellee Dow AgroSciences LLC certifies

that the brief contained herein has a proportionally spaced 14-point

typeface, and contains 13,996 words, based on the "Word Count" feature

of Word 2007, including footnotes and endnotes.  Pursuant to Federal

Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule

32(b), this word count does not include the words contained in the

Certificate of Interest, Table of Contents, Table of Authorities,

Abbreviations, and Statement of Related Cases.


Dated:    February 19, 2013      Respectfully submitted,

                                 By: /s/ Mark S. Davies
                                 *Attorney for Defendant-Appellee*
                                 *Dow AgroSciences LLC*